

# United States District Court
## NORTHERN DISTRICT OF GEORGIA



FILED IN OPEN COURT
U.S.D.C. Atlanta

MAY 15 2014

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

UNITED STATES OF AMERICA

v.

ADAM PIOMBINO

**CRIMINAL COMPLAINT**
Case Number: 1:14-MJ-00500

UNDER SEAL

I, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about April 10, 2014 in Fulton County, in the Northern District of Georgia, defendant(s) did, possess with the intent to distribute, and conspire with others, known and unknown, to knowingly and intentionally possess with the intent to distribute, a detectable amount of Oxycodone, a Schedule II controlled substance,

in violation of Title 21, United States Code, Section 846.

I further state that I am a(n) Task Force Officer and that this complaint is based on the following facts:

**PLEASE SEE ATTACHED AFFIDAVIT**

Continued on the attached sheet and made a part hereof.   Yes

_____
Signature of Complainant
Kenneth Morrow

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to before me, and subscribed in my presence

May 15, 2014                                                     at    Atlanta, Georgia
Date                                                                         City and State

E. CLAYTON SCOFIELD, III
UNITED STATES MAGISTRATE JUDGE                              _____
Name and Title of Judicial Officer                                         Signature of Judicial Officer
AUSA C. Brock Brockington / (404) 581-6198

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Kenneth R. Morrow Jr., first being duly sworn, depose and say:

### AFFIANT BACKGROUND

1. I, Kenneth R. Morrow Jr., am a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA"), and have been so employed since 2013. I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. Prior to working with the DEA, I was a deputized Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms, and Explosives for two years (2012-13) working in the violent crimes unit.

2. I have worked closely with other special agents of the Drug Enforcement Administration, Bureau of Alcohol, Tobacco, Firearms, and Explosives, as well as state and local law enforcement, and have assisted in numerous Federal investigations of unlawful drug trafficking organizations. Your Affiant has received nine (9) weeks of specialized training at the Georgia Public Safety Training Center in Forsyth, Georgia. I have completed over 1,200 hours of training to include Drug Undercover Operations, Interviews & Investigations, Drug

1

Identification, Criminal Procedure, and numerous other drug and investigative courses.

3. I have conducted numerous firearms and narcotics investigations including, but not limited to, distribution of narcotics, trafficking, distribution and the possession of firearms during the commission of a felony. Your Affiant has personally conducted and/or assisted in several investigations of criminal acts involving violations of the Controlled Substance Act, found in Title 21 of the United States Code. Many of these investigations focused on individuals who have derived income from illegal sources, namely, from the unlawful distribution of cocaine, methamphetamine, marijuana and other controlled substances.

4. To date, my participation in drug trafficking investigations has resulted both in the successful prosecution of numerous individuals and the forfeiture to the United States Government of assets purchased with the proceeds from unlawful drug trafficking, as well as assets used to facilitate said violations. In connection with drug trafficking investigations, I have participated in and/or executed several search warrants, including residences of drug traffickers/manufacturers and their co-conspirators/associates, stash houses used as storage and distribution points for controlled substances, and business offices used by drug dealers as "fronts" to conceal their unlawful drug-trafficking activities and

the proceeds obtained from unlawful drug trafficking. By virtue of my training and education, I have experience in debriefing defendants, co-conspirators, witnesses and informants who have been involved in unlawful drug trafficking and who have had personal experience involving the techniques and methods by which drug traffickers/manufacturers maintain records to identify and locate other drug conspirators, the amounts of drugs distributed and to whom the drugs are distributed, the monies owed and paid for drugs, as well as the techniques and methods by which drug traffickers/manufacturers acquire, spend, convert, transport, distribute and conceal the proceeds they derive from unlawful drug trafficking.

5. The following information has been derived from my personal participation in the investigation, examination of reports and records, surveillance operations, and various other sources of information. Some of the information contained in this affidavit was made known to me by other law enforcement agents who also participated in the investigation of this case. Where this affidavit states an opinion or belief, the opinions and beliefs are based upon my familiarity with this information, as well as my experiences in other drug trafficking cases and training I have received. I have not included in this affidavit every fact known to me

relating to this investigation, and instead include only those facts necessary to establish probable cause for a Criminal Complaint against the following subjects:

      a.     Adam PIOMBINO; and

      b.     Andrew THORESON,

for violations of the federal narcotics laws, namely Title 21, United States Code, Sections 841 and 846.

## THE INVESTIGATION

6.    In January 2014, a confidential source (CS)[1] provided information to the DEA Tactical Diversion Squad regarding a white male, Adam Charles PIOMBINO, who distributes quantities of oxycodone dosage units (pills) from his residence. The CS advised that he has been a "customer" of PIOMBINO's for approximately three (3) years and has purchased a variety of controlled substances in the form of schedule II narcotic pills (hydromorphone and oxycodone).

---

[1] This confidential source has briefly worked with the DEA for monetary purposes. This CS has provided reliable information, which has been independently corroborated. Moreover, the information the CS has provided in this case has proven to be truthful. The CS approached the DEA with information on a narcotics trafficker. The CS gave information about his residence, vehicles, and method of distribution. The narcotics trafficker lives where the CS stated he lives, drives the vehicles that were described by the CS, and has sold narcotics out of the back of his residence just like the CS indicated he would. For this reason, I believe the CS to be credible.

4

Additionally, the CS stated that he has purchased oxycodone from PIOMBINO inside of his residence in the past and noted that, on one occasion, there were at least "a thousand" pills located in a kitchen drawer next to the refrigerator in the kitchen area at one time. Considering the CS's transaction history with PIOMBINO, agents sought to organize a controlled purchase of narcotics.

### April 10 CS Controlled Purchase

7. On April 10, 2014, agents arranged a controlled purchase of Oxycodone between the CS and PIOMBINO. The CS placed a recorded phone call to PIOMBINO and advised him that an associate named "Stevie" wanted to purchase 200 x 30mg oxycodone pills. Additionally, agents directed the CS to ask if PIOMBINO would offer a discounted rate because of the high number of pills the CS planned to purchase. PIOMBINO indicated that he would reduce his usual price from $30 per pill down to $29 per pill, for a total transaction price of $5,800. In advance of the controlled purchase, agents briefed the CS, and then searched the CS's person and the CS's vehicle for contraband. After finding no contraband, agents provided the CS with $6,000.00 in official advanced funds (OAF) to purchase the narcotics, and with a covert recording device so the CS could document the transaction.

8. The CS drove to PIOMBINO's residence and parked in the rear parking area. The CS called to alert PIOMBINO of his/her arrival. During the telephone call, PIOMBINO revealed that he only had 190 x 30mg oxycodone pills available, but that he planned to receive another shipment later that night. PIOMBINO promised to provide the CS with the remainder of the pills (including an additional 10 tablets from an earlier controlled purchase) on April 11, 2014, the next day.

9. According to the CS, PIOMBINO exited the door in the back of the building closest to his unit, and let the CS in through the locked gate. The CS walked up through the walkway towards the back door of the building, but before entering PIOMBINO's condominium, PIOMBINO explained that his pet pitbull had broken his pen and was lose in the loft. Instead of entering his unit to conduct the transaction, PIOMBINO positioned himself behind the CS and dropped a small glass vile into his/her shirt pocket. The CS gave PIOMBINIO $6,000.00 in OAF and told him that "Stevie" wanted seven (7) more oxycodone pills instead of receiving $200 in change. PIOMBINO agreed to provide an additional 7 pills along with the remainder described above, and the two later parted ways.

10. The CS then left PIOMBINO's residence and drove to a predetermined location to meet with agents. The CS produced the small glass vile

that PIOMBINO placed in his front shirt pocket and the pills were counted. Agents counted one hundred and eighty pills (180) and determined that the vial was ten (10) pills short of what PIOMBINO claimed to give the CS. Agents entered the markings etched on the tablets into a database on the website Pills.com, and concluded that all 180 tablets were 30mg oxycodone pills. The pills were packaged and mailed to the DEA Southeastern Laboratory for testing.

11. Agents searched the CS to rule out the possibility that he/she had taken ten of the pills. Satisfied that the CS was not concealing any contraband, agents directed the CS to contact PIOMBINO and inform him of the missing pills. PIOMBINO admitted to inadvertently "shorting" the CS. The CS was directed to return to PIOMBINO's residence and obtain the ten (10) missing pills. Further, the CS was instructed to have "Stevie" on the phone with him/her when in the presence of PIOMBINO so they could discuss why the CS was being shorted again. The CS then drove back to PIOMBINO's residence and parked in the rear parking area. The CS placed a recorded phone call to PIOMBINO who exited the rear of the building at the door closest to Unit #5. At that time, the CS told PIOMBINO that "Stevie" was on the phone, and that he wanted to speak with PIOMBINO to discuss the discrepancy in the pill quantities. "Stevie" (a law enforcement officer in an undercover capacity) spoke with PIOMBINO at length

about previous discrepancies during drug transactions, how much money was being paid for the oxycodone pills, and how to rectify the situation moving forward. PIOMBINO agreed to give the CS twenty (20) 30mg oxycodone pills right then, and seventeen (17) more pills the next day. Agents inspected the 20 pills that PIOMBINO gave the CS and they were marked with "K/9" on one side of the tablets. A check on the Pills.com website revealed that the markings indicated that the seized pills were 30mg oxycodone tablets. The pills were packaged and mailed to the DEA Southeastern Laboratory for testing.

### April 11 Controlled Pickup

12.   On April 11, 2014, agents arranged for the CS to obtain seventeen 30mg pills, the remainder from the previous day's deal. The CS placed a recorded phone call to PIOMBINO to advise him that he/she was ready to pick up the 17 x 30mg oxycodone pills that PIOMBINO owed "Stevie." PIOMBINO responded to the CS via text message, advising the CS that he (PIOMBINO) was not home and that THORESON was at his residence and would provide him the 17 pills. Agents briefed the CS, searched the CS and the CS's vehicle for contraband and found none, and gave the CS a recording device. The CS drove over to PIOMBINO's residence, and called THORESON to alert him know that he/she was in the rear parking area. According to the CS, THORESON exited the back door of the

condominium nearest PIOMBINO's unit, walked down the walkway out to the parking area, and tossed a plastic bag into the CS's vehicle. THORESON indicated that he had somewhere to be, and he returned inside the condominium. The CS then drove to a predetermined location and met with agents. The CS and the CS's vehicle were searched for contraband with negative results. The 17 pills were inspected by agents and had "K/9" imprinted on one side of the tablets. Agents referred to the Pills.com website, and the database indicated that the pills were 30 mg oxycodone tablets. The pills were packaged and mailed to the DEA Southeastern Laboratory for testing.

## CONCLUSION

13. Based upon the aforementioned facts, there is probable cause to believe that on or about April 10 and 11, 2014, PIOMBINO and THORESON, in the Northern District of Georgia, did knowingly possess with the intent to distribute, and conspire to possess, with the intent to distribute, a detectable amount of Oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846.